UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| JOYCE ATKINSON, ) | |
| ) | |
| Plaintiff, ) | Case No. EDCV08-1736 AJW |
| ) | |
| v. ) | |
| ) | MEMORANDUM OF DECISION |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of the Social ) | |
| Security Administration, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's applications for disability insurance benefits and supplemental security income benefits. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

**Administrative Proceedings**

The parties are familiar with the procedural facts, which are summarized in the Joint Stipulation. [See JS 2]. In a June 2008 written hearing decision that constitutes the Commissioner's final decision in this case, an administrative law judge ("ALJ") concluded that plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform a range of light work, and her RFC did not preclude her from performing her past relevant work as either a front desk receptionist or an assistant manager in a

ladies clothing store. [AR 14-18].

**Standard of Review**

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or is based on legal error. Stout v. Comm'r Social Sec. Admin., 454 F.3d 1050, 1054 (9th Cir. 2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)(internal quotation marks omitted). The court is required to review the record as a whole and to consider evidence detracting from the decision as well as evidence supporting the decision. Robbins v. Soc. Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006); Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir.1999)).

**Discussion**

**Obesity**

Plaintiff contends that the ALJ improperly "ignored without explanation or consideration" a diagnosis of obesity by her treating physician, and also erred in failing to consider the impact of plaintiff's obesity at each stage in the sequential evaluation procedure. [See JS 3-4].

A treatment report dated from April 6, 2006 from High Desert Community Care Center ("HDCCC") stated that plaintiff weighed 178 pounds. The notation "obese" appears on that report next to a checklist for examination findings, but no diagnosis of obesity appears in the section entitled "Impression." [AR 161]. Plaintiff's height was not noted on that report; however, her height was measured at 61.5 inches by the Commissioner's consultative orthopedist. [AR 131].

The ALJ found that plaintiff had a severe musculoskeletal system impairment from minor degenerative changes. [AR 14]. The ALJ did not discuss the notation that plaintiff was "obese," plaintiff's weight or make findings regarding obesity. [AR 12-17].

Under the "treating physician rule," the ALJ must provide clear and convincing reasons, supported by substantial evidence in the record, for rejecting an uncontroverted treating source opinion. If contradicted

by that of another doctor, a treating or examining source opinion may be rejected for specific and legitimate reasons that are based on substantial evidence in the record. Batson v. Comm'r of Social Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); Tonapetyan v. Halter, 242 F.3d 1144, 1148-1149 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995).

Plaintiff's reliance on the treating physician rule is misplaced. First, neither the April 6, 2006 HDCCC report nor any other treating source report in the record included a formal diagnosis of obesity or any opinion regarding the effect of obesity on plaintiff's ability to work. [AR 161]. Thus, the argument that the ALJ "rejected" a treating source opinion is misguided.

Second, the progress note with the notation "obese" was signed only by an "NP" or nurse practitioner. [AR 161]. A nurse practitioner is not an "acceptable medical source" within the meaning of the Commissioner's regulations, but instead is considered an "other source." See 20 C.F.R. §§ 404.1513(a)&(d), 416.913(a)&(d)(distinguishing between "acceptable medical sources" and "other sources"). There is no evidence that a licensed physician signed or endorsed the nurse practitioner's conclusions. Evidence from an acceptable medical source is required to establish the existence of a "medically determinable impairment," and only a "medically determinable impairment" or combination of such impairments can be found severe or disabling. See 20 C.F.R. §§ 404.1508, 404.1513(a), 416.908, 416.913(a). Therefore, the ALJ could not have found that plaintiff's obesity was a severe, medically determinable impairment, alone or in combination with her other impairments, based solely on the nurse practitioner's findings. See Social Security Ruling ("SSR") 00-3p, 2000 WL 33952015, at * 2 ("When we identify obesity as a medically determinable impairment . . . , we will consider any functional limitations resulting from the obesity in the RFC assessment, in addition to any limitations resulting from any other physical or mental impairments that we identify.").

Third, the mere diagnosis of an impairment, without more, does not establish that the impairment is severe or disabling. Therefore, even if plaintiff had received a diagnosis of obesity from a treating physician, that alone would not establish a limitation in her ability to work. See, e.g., Sample v. Schweiker, 694 F.2d 639, 642-643 (9th Cir. 1982) (noting that the existence of a diagnosed emotional disorder "is not per se disabling," and that "there must be proof of the impairment's disabling severity"); Hinkle v. Apfel, 132 F.3d 1349, 1352 (10th Cir. 1997) (stating that a claimant "must show more than the mere presence of

a condition or ailment" at step two) (citing Bowen v. Yuckert, 482 U.S. 137, 153 (1987)). Plaintiff's argument that the ALJ improperly rejected a treating source opinion lacks merit.

Plaintiff also contends that the ALJ erred in failing to "properly consider the combination or impact" of her obesity throughout the sequential evaluation procedure. [JS 5-6]. In Celaya v. Halter, 332 F.3d 1177 (2003), the Ninth Circuit held that the ALJ "had a responsibility to consider [the] interactive effect" of the claimant's obesity "upon her other impairments, and its effect on her ability to work and general health," even though her obesity, standing alone, was not severe. Celaya, 332 F.2d at 1182. The Ninth Circuit explained that the ALJ should have included obesity in a "multiple impairment analysis" for three reasons. First,

> First, [obesity] was raised implicitly in [the claimant's] report of symptoms. Second, it was clear from the record that [her] obesity was at least close to the listing criterion, and was a condition that could exacerbate her reported illnesses. Third, in light of [the claimant's] pro se status, the ALJ's observation of [the claimant] and the information on the record should have alerted him to the need to develop the record in respect to her obesity.

Celaya, 332 F.3d at 1183.

Celaya is distinguishable. In that case, the claimant did not allege obesity as a disabling condition, but her obesity was so pronounced that the ALJ could not reasonably have failed to appreciate its potential effect on her other impairments. The claimant in Celaya had "a Body Mass Index of at least over 44, [which] well exceeded the criterion level of 40 that would categorize her as 'extremely obese," the highest of the three obesity levels used by the SSA. Celaya, 332 F.3d at 1179 (quoting SSR 00-3p, 2000 WL 33952015, at * 2) (referencing National Institutes of Health Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults (NIH Publication No. 98-4083, September 1998)). At 178 pounds—plaintiff's weight on the HDCCC report labeling her "obese"—her Body Mass Index was 33.1, which is in the lowest of the three obesity categories and is not considered extremely obese. See SSR 00-3p, 2000 WL 33952015, at * 2.

In Celaya, moreover, the ALJ found that the claimant had independently severe diabetes and hypertension, both serious conditions whose association with obesity is well-recognized. See SSR 00-3p, 2000 WL 33952015, at *3 (stating that obesity increases the risk of developing diabetes and hypertension).

1    In this case, on the other hand, the ALJ found that plaintiff had only a severe musculoskeletal impairment.
2    Obesity may cause or exacerbate a musculoskeletal disorder such as osteoarthritis, but plaintiff presented
3    no medical evidence or testimony that her weight caused or exacerbated her complaints of back pain and
4    hand pain. The ALJ correctly observed that plaintiff had generally mild objective findings of a
5    musculoskeletal impairment, without medical evidence or testimony attributing her medical conditions or
6    symptoms to excess weight. For example, the ALJ noted that April 2006 lumbar spine x-rays showed only
7    mild degenerative arthritis and mild levoscoliosis, while x-rays of the sacrum and coccyx appeared normal
8    for her age. Nothing in plaintiff's medical reports indicates that plaintiff or her treatment providers linked
9    her clinical presentation or subjective complaints to obesity. Plaintiff's treatment reports also do not include
10   any documented recommendations for weight loss. [AR 15, 128-129]. See Burch, 400 F.3d at 683-684
11   (distinguishing Celaya on the ground that although the claimant's doctors noted her obesity and
12   recommended a weight loss program, "[t]he medical record is silent as to whether and how claimant's
13   obesity might have exacerbated her condition," and affirming the ALJ's decision that the claimant could
14   perform light work despite some back discomfort).

15   Plaintiff also does meet the second prong of the Celaya test. In that case, the claimant's weight did
16   not meet the threshold in the listing for obesity, but it "was at least close . . . ." Celaya, 332 F.2d at 1182.
17   In 1999, after the administrative hearing in Celaya, the Commissioner deleted obesity from the listing of
18   impairments, and instead instructed adjudicators to consider whether obesity, alone or combined with other
19   impairments, may cause or exacerbate a claimant's functional limitations. See Celaya, 332 F.3d at 1181 n.1;
20   20 C.F.R. Part 404, Subpart P, Appendix 1, ¶¶ 1.00Q, 3.00I & 4.00I. Under the former listing for obesity,
21   however, plaintiff's weight was not close to the listing threshold. A woman of plaintiff's height had to weigh
22   110 kilograms (242 pounds) to meet the weight criterion in the listing. See 20 C.F.R. Pt. 404, Subpt. P, App.
23   1, § 9.00 & Table II  (1999). As reflected in her medical reports, plaintiff's weight consistently was 50
24   pounds or more below the former listing level. [See AR 131, 152-158].

25   The third Celaya factor also is absent in this case. Unlike "the illiterate, unrepresented claimant who
26   very likely never knew that she *could* assert obesity as a partial basis for her disability," Celaya, 332 F.3d
27   at 1183, plaintiff was represented during the administrative hearing by the same experienced social security
28   disability lawyer who is representing her in this case. Counsel examined plaintiff during the hearing, but

5

she did not testify about any adverse effects of her weight on her functioning, and counsel did not raise or argue the issue to the ALJ. [See AR 18-24]. See Burch, 400 F.3d at 682 (distinguishing Celaya because the claimant was represented by counsel during the administrative hearing).

The ALJ did not erroneously reject a treating source opinion, nor did he commit legal error in failing explicitly to consider the interactive effects of plaintiff's obesity on her other impairments.

**Side effects from medications**

Plaintiff argues that the ALJ improperly disregarded evidence concerning two of her prescribed medications, Ditropan and Propranolol. [See JS 11-14].

In evaluating a claimant's subjective symptoms, the ALJ must consider, among other things, the type, dosage, effectiveness, and adverse side effects of any pain medication. See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p, 1996 WL 374186, at *3. Plaintiff contends that the ALJ improperly ignored evidence that plaintiff experienced dry mouth, dribbling, and coughing from Ditropan, a medication used to treat overactive bladder. [JS 11].

On her first visit to HDCCC in March 2006, plaintiff complained on urine leakage when she coughed or sneezed. She was diagnosed with stress incontinence and prescribed Ditropan. [AR 162]. The progress note for her next visit in April 2006 states that plaintiff "had to stop Ditropan" because of dry mouth, dribbling, and coughing. [AR 161]. No alternative medication was prescribed. Plaintiff was referred to a gynecology clinic for follow-up [AR 123, 160], but the record does not indicate whether she received any further treatment for incontinence.

The ALJ noted that plaintiff at one time "was prescribed medication for stress incontinence, but . . . discontinued that medication because of side effects." [AR 15 (citing AR 123)]. Since plaintiff took Ditropan for no more than a month, the ALJ did not err in failing to take into account any side effects plaintiff briefly experienced from that medication before discontinuing it.

Plaintiff also argues that because her dosage of Propranolol[1] was increased, the ALJ should have

---

[1] Propranolol is prescribed

> to treat high blood pressure, abnormal heart rhythms, heart disease, pheochromocytoma (tumor on a small gland near the kidneys), and certain types of tremor. It is also used to prevent angina (chest pain) and migraine headaches.

inferred that plaintiff's condition had "decompensated." [JS 11]. [See AR 152]. A progress note from HDCCC dated May 7, 2007 states that plaintiff presented with complaints of lower back pain, right hip pain, upper back and shoulder pain. Her blood pressure was 190/102. Her prescriptions and blood pressure were discussed. [AR 152]. Plaintiff's diagnoses were hypertension, osteoarthritis, and myalgia. Her dosage of Propranolol was increased to 20 milligrams by PO BID (by mouth twice a day). No specific explanation was provided for the increase. [AR 152].

There is simply nothing in the record suggesting that the increase in plaintiff's Propranolol dosage is indicative of "decompensation," which is defined in the Commissioner's regulations as an exacerbation or temporary increase in *psychologically-based* signs or symptoms, accompanied by a loss of functioning in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. See 20 C.F.R., Pt. 404, Subpt. P, § 12.00.C.4. Plaintiff quotes that definition of "decompensation," but she makes no attempt to explain how that concept applies in this factual context. [See JS 12-13]. The only rational inference the ALJ could have drawn from the increase in plaintiff's Propranolol dosage in May 2007 was that her hypertension had worsened, and she needed a higher dose of medication to bring it under control. That inference would have been warranted. Between March 2006 and November 2, 2006, plaintiff had blood pressure readings of 130/80, 140/80, 136/70, 136/81, 148/82, and 140/90. [AR 158-162]. During this period, plaintiff did not have a diagnosis of hypertension, despite being both overweight and a smoker. On November 20, 2006, she was diagnosed with hypertension and prescribed Propranolol (brand name Inderal). For reasons that are not apparent from the record, her blood pressure reading on that date is blacked out. [AR 155]. During her December 2006 visit, plaintiff reported that she was "not taking B/P meds," and her blood pressure reading was 190/60. [AR 154]. Plaintiff was advised that she must take blood pressure medication "ASAP." [AR 15, 154]. On her next visit in May 2007, her blood

---

> Propranolol is also used to improve survival after a heart attack. Propranolol is in a class of medications called beta blockers. It works by relaxing blood vessels and slowing heart rate to improve blood flow and decrease blood pressure.

National Library of Medicine, National Institutes of Health, Medline Plus website, Propranolol Oral, available at http://www.nlm.nih.gov/medlinepluse/druginfo/meds/a682607.html (last visited Nov. 3, 2009).

7

pressure was 196/102, the highest reading recorded in the record. Plaintiff's Propranolol dosage presumably was increased for that reason. [AR 152]. In June 2007, her blood pressure dropped to 172/84. [AR 151-152]. In October 2007, it was 150/78. [AR 185]. There are no more recent treatment records. None of plaintiff's treatment reports mention complications from hypertension or any functional limitations associated with that condition.

The ALJ permissibly determined that there was no evidence that plaintiff's hypertension or stress incontinence had more than a minimal effect of plaintiff's ability to perform work-related activities. [AR 15]. That finding is supported by substantial evidence, and there was no error in the ALJ's assessment of the side effects and dosage of plaintiff's medications.

**Past relevant work**

Plaintiff argues that the ALJ did not discuss the mental and physical demands of plaintiff's past relevant work, and "did not cite any evidence of record or a reliable source of vocational data" to support his finding that plaintiff could perform her past relevant work. [See JS 14-19].

A social security disability claimant bears the burden of proving that she cannot perform either the "actual functional demands and job duties of a particular past relevant job" or the "functional demands and job duties of the occupation as generally required by employers throughout the national economy." Pinto v. Massanari, 249 F.3d 840, 845 (9th Cir. 2001) (quoting SSR 82-62); see also Burch, 400 F.3d at 679; Villa v. Heckler, 797 F.2d 794, 798 (9th Cir. 1986). The ALJ's obligation is "to make the requisite factual findings to support" the conclusion that the claimant can perform past relevant work. "This is done by looking at the residual functional capacity and the physical and mental demands of the claimant's past work." Pinto, 249 F.3d at 844-845 (quoting 20 C.F.R. §§ 404.1520(e) and 416.920(e)).

The ALJ found that plaintiff can perform light work that does not require climbing ladders, ropes, or scaffolds, or exposure to dangerous conditions, such as working at heights or with dangerous machinery. [AR 15]. The ALJ found that plaintiff did not have any mental limitations. [AR 14-15].

Relying on plaintiff's description of her past work in her work history report, the ALJ found that plaintiff had performed the job of front desk receptionist at a sedentary level of exertion and the job of assistant manager of a ladies clothing store at a light level of exertion. [AR 16; see AR 85-86]. He wrote that "[i]n comparing the claimant's residual functional capacity with the physical and mental demands of

this work, I find that the claimant is able to perform it as actually and generally performed. Her past relevant work is well within her residual functional capacity." [AR 16].

The ALJ did not err in relying upon and adopting plaintiff's description of her past work in her work history report. "The claimant is in the best position to describe just what he or she did in [past relevant work], how it was done, what exertion was involved, what skilled or semiskilled work activities were involved, etc." SSR 82-41, 1982 WL 31389, at *4. A claimant's properly completed vocational report may be used to define a claimant's past work as actually performed. Pinto, 249 F.3d at 845 (citing SSR 82-61, 1982 WL 31387, at *2). If plaintiff can still perform her past relevant work as she actually performed it, she is not disabled. See Pinto, 249 F.3d at 845.

Plaintiff does not contend that the physical or mental demands described in her vocational reports for the two jobs identified by the ALJ were inconsistent with her RFC as categorized by the ALJ. The ALJ made adequate findings to support his determination that plaintiff's past jobs as a front desk receptionist and assistant manager in a ladies clothing store were within plaintiff's RFC, and those findings are based on substantial evidence and free of legal error.

**Conclusion**

For the reasons stated above, the Commissioner's decision is supported by substantial evidence and reflects application of the proper legal standards. Accordingly, defendant's decision is **affirmed.**

**IT IS SO ORDERED.**

November 5, 2009

_____
ANDREW J. WISTRICH
United States Magistrate Judge